Huguette Nicole Young, Ph.D.
24968 Lawrence Road
Junction City, OR 97448
Phone: 415-948-8076
E-mail: hn_young@yahoo.com
Pro se

FILED _____ LODGED
_____ RECEIVED _____ COPV

OCT 2 7 2020

CLERK U.S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

United States District Court

District of Arizona

Phoenix Division

HUGUETTE NICOLE YOUNG,                    CASE NO. cv-20-1686-PHX-GMS

            *Plaintiff,*                  SECOND AMENDED COMPLAINT FOR
                                          DECLARATORY AND EMERGENCY
v.                                        INJUNCTIVE RELIEF

JERRY WEIERS, in his official capacity
as mayor of Glendale, Arizona,

            *Defendant.*

_____

This Second Amended Complaint differs in substance from the First Amended Complaint in

three ways: 1) the term "inability to communicate expressively" was added to paragraph 2 as an

injury caused by face mask mandates to cover a First Amendment right to smile at others, 2) a

footnote added to paragraph 7 and stronger wording in paragraph 17 clarify an intentional

muddying of the waters carried out by scientists who should know better concerning mortality

rates of Covid-19, and 3) paragraphs 19-21 covering Jurisdiction, Standing, and Parties have been

modified to reflect plaintiff's updated status in seeking new employment, partnership, support,

and/or training opportunities in Glendale, AZ, in the legal profession.

        Plaintiff complains as follows:

THIS DOCUMENT IS NOT IN PROPER FORM ACCORDING
TO FEDERAL AND/OR LOCAL RULES AND PRACTICES
AND IS SUBJECT TO REJECTION BY THE COURT.
REFERENCE _CJVLR 5.4_
(Rule Number/Section)

# Introduction

1. This is a constitutional challenge to a proclamation mandating masks (hereby referred to as Mask Proclamation) issued by the mayor of Glendale, AZ, Jerry Weiers, on June 19, 2020 (effective June 20, 2020), stating:

> "all individuals within the jurisdiction of the City of Glendale are required to wear face coverings in all places of public accommodation if they are or will be in contact with other individuals who are not within a small group of people they are closely and frequently associated with and in spaces where it is difficult or impossible to maintain physical distancing. Physical distancing is defined as keeping a six (6) foot distance between individuals not within their frequent and common association group or unit."

2. Mask Proclamation violates plaintiff's First Amendment right of free speech under the United States Constitution by literally blocking plaintiff's ability to communicate audibly, clearly, and expressively (e.g., by violating plaintiff's right to smile at others) while wearing a face mask, so much so that many like plaintiff who are rightfully offended by blanket face mask orders (that appear, in the absence of transparency, to be based mostly on political power grabbing in the face of unjustified hysteria) refer to face mask orders under these conditions as muzzle orders. Defendant may claim the government has a long history of being able to ignore First Amendment rights and force citizens to wear muzzles without any checks as long as the government muzzles all citizens equally, and not just plaintiff alone, so as to avoid charges of discriminatory behavior. Plaintiff strongly disputes this warped defense of government face mask mandates.

3. The government, including Mayor Weiers, may violate plaintiff's right to free speech with a law, order, or rule if the government can do two things: 1) The government shows a compelling public interest in issuing the rule that outweighs violating plaintiff's rights, and 2) the law addresses the compelling public interest in the most specific and effective way possible so as to be least intrusive on plaintiff's rights. This is referred to as a strict scrutiny standard of review,

and the court must apply this standard to any law, order, or rule that infringes upon the most fundamental of all human rights. The First Amendment right to free speech falls into the category of rights that require the highest level of protection, and therefore laws like Mask Proclamation, which infringe on plaintiff's right to free speech, must pass strict scrutiny.

4. The federal government has not issued face mask requirements in any jurisdiction, only state and local governments have done so. However, many health experts and scientists in the federal government who should know better are purposely skewing scientific data to make it appear Covid-19 is a public health disaster and to imply that requiring face masks is the best way to address this public health disaster, thereby giving the appearance that face mask orders like Mask Proclamation pass both prongs of the strict scrutiny test. This is a fallacy.

5. The most reliable scientific data to date shows all state and local face mask orders, including Mask Proclamation, fail both prongs of the strict scrutiny test because 1) as of June, 2020, there is no state, county, or city in the United States that has shown Covid-19 qualifies as a public health disaster (or even an imminent public health disaster) within its jurisdiction, at least not a disaster that is worse than the flu in terms of estimated number of deaths and estimated number of people infected, and 2) face mask requirements like Mask Proclamation most likely lead to a significant increase in spread of the virus through surface contacts while having little to no effect on spread of the virus through the air (at least no effect that can not just as easily be achieved by having all infected persons cough into the crooks of their elbows), resulting in a net increase in spread of the virus. This is in addition to mounting scientific data showing prolonged face mask use cuts down on oxygen intake for the individual and may cause long term health problems, a concern that is particularly applicable to employees at places like Walmart and Costco who are required to wear face masks 40 to 60 hours a week.

<u>Experts have known Covid-19 is not a pandemic since February, 2020</u>

6. While lay people, politicians, and judges have been left helpless and at the mercy of health experts claiming "we just don't know enough" during the first lockdown phase of Covid-19 disease, we are too far along now and have learned more than enough about the Covid-19 disease to allow the same set of health experts to hoodwink us into a second round of unjustified rights violations. Based on preliminary data out of China, as early as February, 2020, public health officials Anthony Fauci and Robert Redfield, heads of the National Institutes of Allergies and Infectious Diseases (NIAID) and the Centers for Disease Control and Prevention (CDC), respectively, and members of the Presidential Task Force on Coronavirus, acknowledged that Covid-19 was probably not as deadly of a virus as first thought and may end up being close to the seasonal flu in number of deaths and number of people infected [scientists use these two numbers -- number and deaths and number of people infected -- to calculate something called the "mortality rate" (which in turn can mean either the case fatality rate (CFR) or the infection fatality rate (IFR) of a virus, depending on context) which is the single most important number in determining whether a virus qualifies as a public health emergency].

7. On February 28, 2020, Fauci and Redfield wrote in an editorial in the New England Journal of Medicine:

> "The case fatality rate (of Covid-19) may be considerably less than 1%. This suggests that the overall clinical consequences of Covid-19 may ultimately be more akin to those of a severe seasonal influenza (which has a case fatality rate of approximately 0.1%) or a pandemic influenza (similar to those in 1957 and 1968) rather than a disease similar to SARS or MERS, which have had case fatality rates of 9 to 10% and 36%, respectively." ("Covid-19 — Navigating the Uncharted," N Engl J Med 2020; 382:1268-1269 DOI: 10.1056/NEJMe2002387)[1]

---

[1] The case fatality rates (CFR) of Covid-19 and the flu are inaccurately reported here as 0.1%, which is actually the infection fatality rate (IFR) of both Covid-19 and the flu. The CFR's of Covid-19 and the flu are in fact both over 10 times their IFR's, or about 1%. This mistake, which appears to have been done intentionally to muddy the waters concerning the most critical numbers used to determine the deadliness of a virus (at least based on subsequent actions of Fauci in speaking with the media and in testifying to Congress), nevertheless does not detract from the correct premise presented by Fauci and Redfield that Covid-19 is similar to the flu in "mortality rates", ie, in either CFR or IFR, and that viruses with CFR's and IFR's in the 0.1% to 1% range are relatively innocuous compared with SERS or MERS, which have CFR's and IFR's in the 10% to 30% range.

8. Neither Fauci nor Redfield have retracted nor modified this prediction about Covid-19 in any official manner since February, 2020, and most scientific data since the publication of this article have verified that Covid-19 is akin to the seasonal flu in mortality rate. This unfortunately has not stopped Fauci from spinning Covid-19 as a public health disaster in the media. On March 27, 2020, Fauci told Comedy Central host Trevor Noah, "The mortality rate of [COVID-19] is about 10 times [flu] - it's at least 1%" (From "Dr. Fauci Answers Trevor's Questions About Coronavirus | The Daily Social Distancing Show" at https://www.youtube.com/watch?v=8A3jiM2FNR8, time marker 1:11). Fauci purposely neglects to mention that even if the mortality rate of Covid-19 is "about 10 times the flu" (which is not what Fauci claims in writing when speaking to other scientists), the mortality rate of Covid-19 would still be 10 times and 30 times lower than SARS and MERS, respectively (which have mortality rates of 10% and 30%, respectively), and it is highly debatable whether Covid-19 would qualify as a public health emergency even if its mortality rate were "10 times higher" than the flu.

9. That the general consensus in the scientific community from early data out of China is that Covid-19 was not nearly as deadly as originally thought was confirmed by Deborah Birx, another member of the Presidential Task Force on Coronavirus, who said in response to a reporter's question on March 31, 2020, asking why there was no general lockdown ordered to stop the spread of Covid-19 in the United States:

> "I was overseas when this happened, in Africa, and I think when you looked at the China data originally and you said, 'Oh, well, there's 20 million people in Wuhan and 80 million people in Hubei and they come up with a number of 50,000 (deaths), you start thinking of this more like SARS than you do this kind of global pandemic. I mean I'll just be frank. When I looked at it I was like, 'Oh, well, this is not, you know, as close as those quarters are…' so I think the medical community interpreted the Chinese data as this was serious but smaller than anyone expected. And so what was modeled was not a lockdown." (From "March 31, 2020 | Members of the Coronavirus Task Force Hold a Press Briefing" at https://www.youtube.com/watch?v=e9v8ZZd1P0M, time marker 3:50:22).

<u>Four ways experts and scientists may mislead the public on deadliness of Covid-19</u>

10. There are four main ways health officials and scientists who should know better may mislead the public into believing Covid-19 is a public health emergency:

i) Reporting a false or misleading number of deaths caused by Covid-19

ii) Reporting a false or misleading number of people infected by Covid-19

iii) Focusing on number of deaths alone or number of people infected alone without pointing out that it is the combination of these two numbers that produces the most relevant number in determining whether Covid-19 is a public health emergency, i.e., the mortality rate

iv) Blocking death statistics from being publicly available at the county level, increasing the likelihood for inaccurate & fraudulent data being reported at the state or national level for the most important statistics required to determine a public health emergency.

11. In this constitutional challenge plaintiff outlines a standard approach lay people, politicians, and judges can use to evaluate Covid-19 research data that addresses these four main areas of confusion, relying on current scientific consensus. For instance, it is scientific consensus that:

i) The most accurate way to estimate the number of deaths due to an unknown virus like Covid-19 is to calculate the number of "excess deaths" during a particular time frame and specifically not rely on notoriously inaccurate death certificates.

ii) The most accurate way to estimate the number of people infected by a virus like Covid-19 is through antibody (serology) test results and specifically not through reverse transcriptase-polymerase chain reaction (RT-PCR) test results.

iii) The most accurate way to measure the deadliness of a virus like Covid-19 is to calculate the mortality rate of the virus using the most accurate data available from excess deaths and antibody testing.

iv) The most accurate way to obtain excess death data is to have full transparency at the county level, including the county health official listing the total number of deaths *from all causes* reported from each hospital or city coroner within the county for public scrutiny.

12. As of June, 2020, excess death data at the national level published by the CDC indicate the number of excess deaths for the U.S. for the year 2020 will be around 50,000, or about one-fourth the 200,000 deaths currently estimated for Covid-19 for 2020 based on

inaccurate death certificate data. Also as of June, 2020, the most accurate antibody test results indicate that in 2020 about 10% of the population in the U.S., or 35 million people, will have been infected with Covid-19. Using these two estimates for number of deaths and number of infections (keeping in mind that the number of deaths caused by Covid-19 will likely be more accurate when excess deaths are recorded and made available to the public at the county level rather than at the national level), the national mortality rate for Covid-19 is about 0.1%, or the equivalent of the seasonal flu.

13. There are over 3,100 counties in the United States. In much the same way the electoral college was set up by the Framers of the Constitution to help expose and deter election fraud by preventing fraudulent excess votes in one or two counties from determining the president by popular vote, demanding that accurate death counts and infection numbers be reported and made transparent at the county level rather than at the state or national level helps prevent one or two counties from across the country from inaccurately categorizing Covid-19 as a "national pandemic." For example, New York City has a population of 8.4 million or 2.4 percent of the population of the United States, yet New York City claims a whopping 23,000 deaths due to Covid-19, or 15% of all Covid-19 deaths in the United States. If it turns out after evaluating New York City excess death data (and tossing out the highly inaccurate death certificate data) that the number of deaths from New York City due to Covid-19 is closer 8,400, it will have meant that highly inaccurate or fraudulent data from one city alone determined whether Covid-19 is considered a public health emergency across the entire country. For this reason plaintiff asserts all public health emergency declarations must be done on a county by county level. For example, any of Governor Ducey's blanket emergency orders for the entire state of Arizona, including any orders relied upon by defendant Weiers to issue Mask Proclamation, have no justification beyond June, 2020, unless and until state health officials can show Covid-19 data in every county of Arizona results in mortality rates significantly above mortality rates for the seasonal flu. Likewise, defendant Weiers has no justification declaring a public health emergency beyond

June, 2020, unless and until he can show Covid-19 data out of Glendale results in mortality rates significantly above the seasonal flu. It is highly unlikely, given even relatively inaccurate death numbers and infection numbers publicly available at the national level at the CDC for Arizona, that even a single county in Arizona, including Maricopa County where Glendale is located, can show Covid-19 constitutes a public health emergency.

Four main ways experts and scientists may mislead the public on efficacy of face masks

14. Even if Covid-19 were to qualify as a public health emergency in a few of the 3100 counties in the United States, there are four main ways health officials and scientists who should know better may mislead the public on arguments concerning face mask efficacy in these counties as a means to slow the spread of the disease:

i) not clearly distinguishing mask use for preventing the inhalation of Covid-19 versus mask use for preventing the exhalation of Covid-19

ii) assuming that everything (droplets and aerosols) exhaled from the mouth of a person infected with Covid-19 contains live virus particles capable of causing disease in others and also focusing on scientific studies that track the behavior of Covid-19 in aerosols and droplets being "exhaled" from machines rather than studies tracking the behavior of Covid-19 in aerosols and droplets being exhaled directly from real live infected patients.

iii) focusing on the small effect masks might have on cutting potential airborne spread of Covid-19 alone while ignoring the large effect masks probably have on increasing contact or surface spread

iv) ignoring well-known downsides to wearing masks, such as substantial evidence showing that face masks cut down on oxygen intake for the wearers, potentially causing a myriad of short term and long term health problems.

15. Relying on broad scientific consensus is once again the best approach in order to make the face mask data, arguments, and decisions more manageable and fact-based. For example, it is scientific consensus that:

i) With the exception of top level N95 masks reserved exclusively for health care professionals, all other types of masks do little to prevent the mask wearer from inhaling Covid-19 aerosols. All face mask arguments should therefore be limited to how well masks work at preventing people from exhaling Covid-19 particles into the air, the main purpose of face mask requirements by government officials, according to government officials.

ii) The best way to study the exhaled droplets and aerosols of infected people is to

collect samples of droplets and aerosols directly from infected people, not samples of droplets and aerosols created from a machine. In this way the most definitive experiment to date concerning mask efficacy was published in April, 2020, and studied droplets and aerosols exhaled from real coronavirus patients with and without masks [Leung, N.H.L., Chu, D.K.W., Shiu, E.Y.C. *et al.* Respiratory virus shedding in exhaled breath and efficacy of face masks. *Nat Med* 26, 676–680 (2020). https://doi.org/10.1038/s41591-020-0843-2]. Facts and data from this study alone should be determinative in arguments concerning the efficacy of face masks until this data is refuted by further studies. This includes data showing droplets and aerosols from people infected with coronaviruses contained no virus particles unless the person coughed, suggesting that simply breathing or talking is not enough for infected individuals to spread Covid-19 through the air.

iii) The best way to slow the spread of any respiratory virus like influenza (the seasonal flu), rhinoviruses (the common cold), and coronaviruses like Covid-19, is to consider both methods of transmission (airborne transmission through the air and surface transmission through touch), not just airborne transmission. Face mask arguments tend to focus solely on airborne transmission of Covid-19 while ignoring the possible effect mass public face mask use has on increased transmission of Covid-19 through contact with contaminated surfaces, including an infected mask wearer touching his/her own contaminated mask after coughing into the mask or leaking nose mucous into the mask, then spreading the contamination to a myriad of public surfaces like shopping cart handles, pin pads, door knobs, door handles in the refrigerated foods section of the local grocery store, etc.

iv) The best way to protect the public from health risks is to not ignore the most obvious health risk when making a decision about face masks, namely that face masks decrease the amount of oxygen intake for the wearer. The data on oxygen deprivation by masks is much more definitive than any data showing masks prevent airborne transmission of Covid-19, at least not in a way that can just as easily be achieved by coughing into the crook of an elbow.

16. Using this method of scientific consensus to ferret out what is the best data available concerning the efficacy of face masks, then balancing the pros and cons of masks using the most reliable data available, it is clear the best approach to slowing the spread of Covid-19 with minimal health risk to the public is to instruct the public to:

i) avoid wearing masks so as not to decrease oxygen intake and so as to not accidentally contaminate public surfaces like doorknobs and shopping cart handles after touching a mask contaminated with virus particles.

ii) never cough into a mask and always cough into the crook of the elbow because that is the least likely place you will touch with your hands and contaminate your hands with virus particles.

This method also happens to be the best way to avoid infringing on plaintiff's First Amendment

right to free speech and is the method any jurisdiction must follow in order to meet the second prong of the strict scrutiny standard of review.

17.  Plaintiff asks the court to declare Mask Proclamation unconstitutional and issue an injunction barring defendant Jerry Weiers from enforcing this law in his capacity as mayor of Glendale, Arizona, because Mask Proclamation fails both prongs of the strict scrutiny standard of review and because there is a much better way to slow the spread of Covid-19 without impinging on plaintiff's right of free speech, namely, banning use of masks by the general public and instructing the public to cough into the crooks of their elbows.  Plaintiff is requesting an emergency injunctive order because there is a high likelihood the mask requirement in Mask Proclamation is causing greater spread of Covid-19 in the public rather than decreasing spread. This case can and should be adjudicated quickly and cleanly because no jury trial is needed, no expert witnesses are needed (plaintiff presents only premises that have broad scientific consensus and uses only the words of Fauci and Birx -- probably defendant's two main expert witnesses -- to support her arguments), and the only discovery involves extracting the most accurate Covid-19 death counts and infection counts for Glendale, Arizona, data that is readily available yet purposely kept from the public in order to perpetuate a false emergency for political reasons.

## Jurisdiction and Venue

18.  The court has federal subject matter jurisdiction over this action because it is a constitutional challenge to a city ordinance that violates the First Amendment to the United States Constitution, an action which is allowed under 42 U.S. Code § 1983.

19.  The  District of Arizona is the proper venue for this action because the violation of plaintiff's First Amendment right of free speech by Mask Proclamation has already occurred several times since Mask Proclamation was issued and will continue to occur as long as plaintiff is forced to wear a face mask while shopping at Walmart stores in Glendale, Arizona, all of which are within the jurisdiction of this court.[2]

---

[2]  Walmart employees, in practice and as a matter of store policy, do not bother shoppers who are not

Second Amended Complaint

## Standing

20. The three requirements of standing (injury or imminent injury, causation, and redressability) have been met because plaintiff's rights have been violated while shopping at Walmart stores in Glendale, Arizona, in the past (supra) (injury) and will continue being violated as plaintiff is currently seeking new work opportunities in Glendale, Arizona (infra - see "Parties") (imminent injury). In addition to a First Amendment injury, it is likely unsanitary face mask mandates such as Mask Proclamation facilitate the spread of Covid-19 and other diseases throughout the public, increasing health risks to plaintiff and others, especially the weak and elderly, like Mary Jaramillo, the mother of plaintiff's roommate who lives in Glendale, AZ, and who fell ill with Covid-19 most likely after catching it at the Walmart store in Glendale the week after a city-wide mask mandate was issued by the mayor of Glendale. Finally, plaintiff makes it clear to prospective work partners and associates that her current visit to Glendale, Arizona, is likely the last until the face-mask mandate is struck down with no possibility of it coming back at the drop of a hat so that plaintiff can live and work in peace without being bombarded by germs on every public surface and without being muzzled by the mayor of Glendale every time plaintiff wants to go shopping -- all over a non-emergency disease that is less deadly than the flu. Any injury or imminent injury described above, including plaintiff turning down prospective partnerships or employment and training opportunities on the sole basis of a city-wide face mask mandate being in place, are caused by Mayor Weiers' executive order, Mask Proclamation, requiring plaintiff to wear a mask while shopping at any Walmart in Glendale, Arizona (causation). The court can resolve this issue by striking down Mask Proclamation as unconstitutional and issuing an injunction barring Mayor Weiers from enforcing the law (redressability).

## Parties

21. Plaintiff Huguette Nicole Young last worked as a long-haul commercial truck driver

wearing masks unless there is a state or local mask mandate in place.

Second Amended Complaint

with over eight years of experience carrying loads into and out of all lower 48 states but is currently unemployed and pursuing a career shift into the legal profession. Plaintiff's youngest child recently turned 18 and joined the Navy, and plaintiff was both elated and appalled by the treatment plaintiff observed being given to 69 year-old Vietnam veteran and helicopter mechanic Noel Wilkinson, who only has one lung and stage 4 cancer, while shopping at Walmart in Eugene, OR, ranging from a respectful, "Thank you for your service, sir," to "Where's your mask?" followed by looks of disdain. With Mr. Wilkinson's help and blessing, plaintiff is currently seeking support, employment, training and/or partnership opportunities with veterans and veterans help centers across the country, including in Glendale, Arizona, in the field of defending the civil rights of all veterans. Plaintiff is especially well qualified to help veterans with face mask issues because, in addition to being a recent law school graduate specializing in constitutional law, plaintiff is a well-established Ph.D. biochemist whose scientific publications (with plaintiff listed as primary author Huguette Nicole Pelletier) are featured in most biochemistry textbooks. In fact plaintiff had been offered a research position to work as a principal investigator at the NIAID in Bethesda, MD, in 1997 by the director himself, Anthony Fauci, but turned down the job offer and took a position as Professor of Biochemistry at Baylor College of Medicine in Houston instead because plaintiff felt pressured by Fauci to drop an ongoing lawsuit plaintiff had filed against a pharmaceutical company (*Pelletier v. Agouron Pharmaceuticals, Inc,* 1994) to have a paper that the pharmaceutical company published retracted from the scientific literature for reporting fabricated data. The fabricated data is still in the literature, misleading other scientists and causing problems decades later, even after every possible effort by plaintiff to have the fabricated data removed or corrected. This contributed to plaintiff's eventual decision to leave science. Plaintiff currently resides in Junction City, OR, but is eager to relocate anywhere opportunity takes her as long as there is no mask mandate.

22. Defendant Jerry Weiers is the mayor of Glendale, Arizona, and is responsible for enforcing all the laws of Glendale, Arizona, including Mask Proclamation.

## Legal Context

23. The Supreme Court of the United States has adopted three standards of review concerning constitutional challenges to federal or state laws whenever a claim is made that a federal or state law violates a constitutional right of a citizen. From least protective of plaintiff's rights to most protective of plaintiff's rights, these three standards of review are: Rational basis, intermediate, and strict scrutiny, respectively. A rational basis standard means the law must be rationally related to a legitimate government interest, intermediate standard of review means a law must address an important government interest and must do so by means that are substantially related to that interest, and strict scrutiny requires that the law furthers a compelling governmental interest and must be narrowly tailored to achieve that interest. Once a court determines that a strict scrutiny standard of review must be applied to the law, it is presumed that the law or policy is unconstitutional, and the government then has the burden of proving that its challenged law is constitutional.

24. The more fundamental the right that is being violated by the government, the higher the standard of review and the greater the chance the law will be struck down as unconstitutional. Typically, if a right is explicitly stated in the Constitution, such as in the Bill of Rights, a violation of that right by the government will draw the highest, strict scrutiny standard of review. The right to free speech, the basis of this constitutional challenge, is specifically stated in the United States Constitutional under the First Amendment and therefore draws a strict scrutiny standard of review.

25. As mentioned the strict scrutiny standard of review for any law requires a two-pronged test: 1) The law must address a compelling governmental interest, and 2) the law must be narrowly tailored to achieve that interest. The court may strike down a law if it fails either prong of this test. However, under strict scrutiny a law may also be struck down if it can be shown there is a less invasive way to achieve the same compelling government interest. For instance, if the compelling government interest for requiring face masks in public is to decrease spread of

Covid-19 and a better way to achieve that goal, calling on all the most reliable scientific data as well as relying on basic logic and understanding of human behavior -- all while simultaneously protecting plaintiff's First Amendment right to free speech -- is to instruct anybody coughing in public to cough into the crook of their elbow and specifically *not* into a mask, then the court has full authority to strike down Mask Proclamation as unconstitutional even if Mask Proclamation pass both prongs of the strict scrutiny test.

26. Plaintiff claims Mask Proclamation fails both prongs of the strict scrutiny test, and even if Mask Proclamation were to pass the strict scrutiny standard of review, Mask Proclamation would still be unconstitutional because there is a much better way to slow the spread of Covid-19 without requiring masks and violating plaintiff's personal rights. That the better way involves requiring people to *not* wear face masks and more specifically, *not* cough into a face mask but instead cough into the crook of their arms, only adds to the urgency of striking down Mask Proclamation as soon as possible.

27. The sad irony is that it is possible Mask Proclamation might create a public health emergency where there otherwise would not be one without it. This not only underscores the urgency for injunctive relief barring Mask Proclamation and preventing increased spread of Covid-19, but it reveals how arguments over standard of review are almost a moot point in this case because mask requirements like Mask Proclamation probably do not even pass the lowest level of review for a law - the rational basis standard of review. If face masks most likely increase the spread of Covid-19 as plaintiff asserts, there is no rational basis for Mayor Weiers to issue an order that does the opposite of what it set out to achieve, and Mask Proclamation does not even pass the rational basis of review.

## Facts

### Requirements for a public health emergency in Glendale, AZ

28. On June 19, 2020, Mayor of Glendale, AZ, Jerry Weiers issued Mask Proclamation requiring anybody in Glendale, AZ, to wear a face mask while in public. In issuing Mask

Proclamation, Mayor Weiers invoked Arizona Revised Statutes (ARS) §26-311, which grants broad power to local authorities like Mayor Weiers to issue orders to protect the public in cases of emergency. ARS §26-311(A) defines emergency as:

> "fire, conflagration, flood, earthquake, explosion, war, bombing, acts of the enemy or any other natural or man-made calamity or disaster or by reason of threats or occurrences of riots, routs, affrays or other acts of civil disobedience which endanger life or property within the city, or the unincorporated areas of the county, or portion thereof"

<u>Viruses are rarely both deadly and contagious</u>

29. A virus that is highly contagious but is not very deadly, such as the flu, will not qualify as a public health disaster under ARS §26-311(A).

30. A virus that is very deadly but is not very contagious, such as HIV-1, will not qualify as a public health disaster under ARS §26-311(A).

31. Only a virus that is both deadly and contagious will qualify as a public health disaster under ARS §26-311(A). Due to the nature of viruses (e.g., it is not beneficial for a virus to kill its host, so many viruses mutate quickly to be less deadly), it is very rare for a virus to be both deadly and contagious. The only virus commonly cited as being both deadly and contagious is the Spanish Flu from 1918, which was contagious only because of extremely poor hygiene and not a lot of indoor plumbing in that time period. It is doubtful the Spanish Flu would have the same disastrous impact today.

32. The court is expected to base its decisions on facts, reason and logic, not hysteria. If the systematic, fact-based approach to reviewing Covid-19 data outlined here is used, the court will likely determine that Covid-19 is very similar to other coronaviruses that have been around for centuries, i.e., contagious but not very deadly - much like the flu.

<u>How a lay person can tell if a virus is deadly or contagious</u>

33. Any lay person, politician, or judge can evaluate if a virus is deadly or contagious by requesting only two numbers from health officials: 1) The number of people who have died from the virus, and 2) the number of people who have been infected with the virus. Scientists divide

the number of deaths by the number of infections, then multiply the resulting number by 100 to get a number called the mortality rate, which is reported at a %. The higher the mortality rate, the more deadly a virus. Relatively innocuous viruses like the flu and Covid-19 have a mortality rate of 0.1% to 1%. Intermediate viruses have a mortality rate in the 1% to 10% range, and the most deadly viruses have mortality rates that are greater than 10%.

34. It may sound ominous for a city or county health official to say 25 people in Glendale, AZ, will die from Covid-19 in 2020 (the current most accurate estimate) until the city or county health official is then forced to admit that 25,000 people in Glendale, AZ, will be infected with Covid-19 in 2020 (the current most accurate estimate), putting Covid-19 on par with the flu in number of deaths caused and number of people infected, i.e., both the flu and Covid-19 have a mortality rate of close to 0.1% and both will have infected about 25,000 people in Glendale, AZ, in 2020, meaning that while both the flu and Covid-19 are contagious viruses, neither is a particularly deadly virus.

35. Most hysteria over Covid-19 comes from health officials (who should know better) purposely skewing data for the number of people who have died from Covid-19 or for the number of people infected by Covid-19. They skew the numbers to inflate the number of people who have died or deflate the number of people infected so the end result is a relatively high mortality rate (in the range of 1% to 5%) that inaccurately suggests Covid-19 is more deadly than the flu. Another more recent phenomenon is reporting positive test results from the antibody test (or blood/serology test) as a bad thing. Positive test results from antibody tests are a good thing! Because it means the person with a positive antibody test has already had Covid-19, has fully recovered (many times without even realizing he/she was infected with Covid-19), and is most likely immune from either catching Covid-19 or spreading it. In fact, these people are being asked to give their special blood to help others suffering from Covid-19 ("Trump urges people who have recovered from covid-19 to donate blood plasma," https://tinyurl.com/y5amtva5, July 30, 2020) so that the purposeful misinformation campaign currently underway about positive

Covid-19 antibody test results is hindering Covid-19 recovery efforts by preventing people who are gravely ill from receiving life-saving plasma therapy. The slew of city-wide and state-wide mask orders and reclosing of economies for a second lockdown because of so many positive antibody tests are possibly the worst misinformed decisions by mayors, governors, politicians and judges ever made in public health history.

### How to obtain accurate death numbers:  Counting excess deaths

36. Most inaccuracies in reports of the number of deaths due to Covid-19 come from death certificates that incorrectly list Covid-19 as the primary cause of death. Everybody has heard of the story of the person hit by a bus who subsequently tested positive for Covid-19 and was listed and counted as a Covid-19 death.  Whether this report is true or not is, fortunately, of little consequence because for years scientists have anticipated these types of inaccuracies on death certificates and instead relied on something called "excess deaths" to get a more accurate picture of the number of deaths caused by various disasters, including epidemics.  This is best explained by the CDC on its website showing weekly excess death numbers for the United States, stating:

> "Counts of deaths from all causes of death, including COVID-19, are presented. As some deaths due to COVID-19 may be assigned to other causes of deaths (for example, if COVID-19 was not diagnosed or not mentioned on the death certificate), tracking all-cause mortality can provide information about whether an excess number of deaths is observed, even when COVID-19 mortality may be undercounted. Additionally, deaths from all causes *excluding COVID-19* were also estimated. Comparing these two sets of estimates — excess deaths with and without COVID-19 — can provide insight about how many excess deaths are identified as due to COVID-19, and how many excess deaths are reported as due to other causes of death. These deaths could represent misclassified COVID-19 deaths, or potentially could be indirectly related to the COVID-19 pandemic (e.g., deaths from other causes occurring in the context of health care shortages or overburdened health care systems)." (From "Excess Deaths Associated with COVID-19" at https://www.cdc.gov/nchs/nvss/vsrr/covid19/excess_deaths.htm)

37. Calculations for excess deaths can be very complicated or very simple, but the underlying theory of calculating excess deaths is the same, once again best explained by the CDC as follows:

> "Estimates of excess deaths can provide information about the burden of mortality potentially related to the COVID-19 pandemic, including deaths that are directly or indirectly attributed to COVID-19. Excess deaths are typically defined as the difference

between the observed numbers of deaths in specific time periods and expected numbers of deaths in the same time periods. This visualization provides weekly estimates of excess deaths by the jurisdiction in which the death occurred. Weekly counts of deaths are compared with historical trends to determine whether the number of deaths is significantly higher than expected." (From "Excess Deaths Associated with COVID-19" at https://www.cdc.gov/nchs/nvss/vsrr/covid19/excess_deaths.htm)

38. While the CDC uses a somewhat complicated calculation for excess deaths, plaintiff prefers the simplest version because any lay person, politician, or judge can understand it: Total number of deaths expected from all causes for the year 2020 in a particular jurisdiction is estimated from averaging the total number of deaths from the previous five years, i.e., 2015, 2016, 2017, 2018, and 2019. This expected number of deaths is compared to the actual number deaths in the jurisdiction. If there are more deaths than expected in 2020, these deaths are termed "excess deaths" and, depending on where the excess deaths came from, may be attributed either to the Covid-19 disease or to a larger than expected number of people dying from cancer or heart attacks because of poor access to medical facilities due to the shut down.

39. While total death numbers at the county level are typically accumulated and reported at the end of the year, given the importance of these numbers in allowing politicians to make the most informed decisions about public health issues surrounding Covid-19, these numbers must be made publicly available immediately for public scrutiny.

40. Data on excess deaths in the U.S. as reported by the CDC on July 21, 2020, was showing extreme overreporting of deaths due to Covid-19 for April and May, 2020, as was evidenced by large drops in total deaths in the U.S. that were far below expected total death numbers being reported from June to mid-July, 2020 (Figure 1). Two days later on uly 23, 2020, however, the same graph had been "updated" by the CDC so that the data that was showing well below average death counts in the U.S. for June and July, 2020, had disappeared and the new graph appeared as though there was a possible "second spike" of Covid-19 deaths showing up in the data instead (Figure 2).

Figure 1. Weekly number of deaths as reported by the CDC from a select number of causes (not from all causes as erroneously claimed at the top of the graph), as of July 21, 2020, from "Excess Deaths Associated with COVID-19" available at https://www.cdc.gov/nchs/nvss/vsrr/covid19/excess_deaths.htm.



Figure 2. Weekly number of deaths as reported by the CDC from a select number of causes (not from all causes as erroneously claimed at the top of the graph), as of July 23, 2020, from "Excess Deaths Associated with COVID-19" available at https://www.cdc.gov/nchs/nvss/vsrr/covid19/excess_deaths.htm.



41. The CDC may claim that there is a large time gap between a death and the death being reported to the CDC so that the most recent bars measuring excess deaths for 2020 on the CDC excess death charts are usually under-reported, but the graphs shown here purportedly take this into account, according to the CDC, and have included a weighting factor that makes up for this time gap problem. This highlights another problem with CDC data: CDC calculations are so complicated and have so many unknown fudge factors that it is nearly impossible to judge how accurate their various models and predictions really are. For instance, the graphs from the CDC website reported here do not even use total deaths from all causes as required for the most accurate excess death numbers but instead use only the total number of deaths from a select number of related causes like flu or cold. These are not true "excess death" numbers because these charts would not expose outright fraud outlined above where a person dying of a bus accident is listed as a Covid-19 death. Deaths caused by accidents are conveniently missing from the CDC data.

42. Inaccuracies and fraud in data reported by the CDC is well documented elsewhere, most notably by Dr. Pam Popper in her almost daily postings on the subject at various online social media outlets (https://makeamericansfreeagain.com/, https://wellnessforumhealth.com/about/pamela-popper/). This has led to tremendous loss in faith in the CDC by the general public as well as by public officials at the state and local level, most likely prompting a recent decision by the Trump Administration to order all data on Covid-19 related data, including death numbers and test results, to be reported directly to the White House through the Department of Health and Human Services (HHS) as opposed to being reported to the CDC (See "Trump administration cuts CDC out of data collection on hospitalized COVID-19 patients," from USA Today on July 15, 2020, at https://tinyurl.com/yc9wraca).

43. All this underscores plaintiff's repeated requests that all Covid-19 related data, including death numbers and test results, be made available to the public immediately at the county level showing detailed death counts from each hospital or city coroner. Data that is available in this manner for public scrutiny allows inaccuracies and possible fraud to be exposed and corrected right at the source. This type of transparency should be required before any public health emergencies can be declared or extended at either the local or the state level, especially now that we have been dealing with the Covid-19 disease for over six months and know a lot more about it.

How to obtain an accurate number of people infected: Antibody testing

44. The most accurate way to obtain the number of people infected by a virus like Covid-19 is with antibody testing. Antibody tests are sometimes called serum or serology tests because the test uses a blood sample, usually a pinprick on the finger. This is in contrast to RT-PCR tests that use a swab in the nose or throat to collect a sample. Unlike a positive RT-PCR test, which indicates the person tested is currently infected with the virus, a positive antibody test means the person tested has already had the virus in the past and has recovered, many times without even realizing he/she had the disease.

45. At the start of an outbreak antibody tests can be relatively inaccurate, but they very rarely give an overestimate of the number of people infected. Even early, inaccurate antibody tests are therefore useful because they give a ballpark lower estimate of the number of people infected by a virus in a given jurisdiction.

46. As more people contract Covid-19 and recover from mild to no symptoms without even realizing they had contracted the disease, and as antibody tests become more accurate, subsequent antibody testing typically shows an increase in the percent of the population thought to have already been infected with Covid-19. As an example early, inaccurate antibody testing

by Stanford University scientists in March and April of 2020 in Santa Clara County, CA, estimated that about 3% of the population in that county, or about 60,000 people, had already been infected with Covid-1 ("COVID-19 Antibody Seroprevalence in Santa Clara County, California" at https://www.medrxiv.org/content/10.1101/2020.04.14.20062463v2). A month later in April and May, 2020, a slightly more accurate antibody test on a population that had probably been slightly more infected by Covid-19 by that time estimated about 5% of the population, or 500,000 people, in Los Angeles County, CA, had been infected with Covid-19 and had already recovered ["Seroprevalence of SARS-CoV-2–Specific Antibodies Among Adults in Los Angeles County, California, on April 10-11, 2020", *JAMA*. 2020;323(23):2425-2427. doi:10.1001/jama.2020.8279 available at https://jamanetwork.com/journals/jama/fullarticle/2766367]. By June and July of 2020, CDC antibody testing revealed as high as 7% of the population had already been infected by Covid-19 in New York, New Jersey, and Connecticut ("Seroprevalence of Antibodies to SARS-CoV-2 in 10 Sites in the United States, March 23-May 12, 2020," *JAMA Intern Med.* Published online July 21, 2020. doi:10.1001/jamainternmed.2020.4130). Recent estimates from CDC scientists working with ongoing antibody testing put the number of people infected by Covid-19 at as much as 10% to 15% of the population, or ten times higher than results obtained from RT-PCR tests alone ("CDC Antibody Study: Number Infected by COVID-19 in State 6 Times Higher Than Reported" avaliable at https://hartfordhealthcare.org/about-us/news-press/news-detail?articleid=26868&publicId=395).

### As of June 19, 2020, Covid-19 was not a public health disaster in Glendale, AZ

47. As of June 19, 2020, the date Mask Proclamation was issued by Mayor of Glendale Jerry Weiers to address a purported public health disaster, the best data publicly available on Covid-19 showed that about 25 people will die from Covid-19 in Glendale, AZ, in 2020 (¼ of the

current number of deaths expected based on inaccurate death certificates) and about 25,000 people will have been infected by Covid-19 during this same time period assuming about 10% of the population will have contracted Covid-19, numbers that are very similar to the flu, resulting in a mortality rate of 0.1% for Covid-19 in Glendale, AZ, as predicted by top U.S. health officials in February, 2020.

48. The government may argue that these numbers are inaccurate, but it is not up to plaintiff to establish the mortality rate of Covid-19 in Glendale, AZ. Once it has been shown that Mask Proclamation must pass the strict scrutiny standard of review for violating plaintiff's First Amendment right to free speech, the burden of proof shifts to the government to establish the most accurate mortality rate possible for Covid-19 in Glendale, AZ, and to establish that the mortality rate in Glendale, AZ, justifies the claim of a public health emergency, thereby meeting the first prong of the strict scrutiny standard of review that requires a compelling government interest in violating plaintiff's civil liberties. Simply repeating talking points coming from health officials thousands of miles away in Washington, D.C., that Covid-19 is a public health emergency is too vague to pass strict scrutiny.

49. Without providing the court and the public readily available data showing evidence to the contrary that mortality rates for Covid-19 in Glendale, AZ, are most likely akin to the seasonal flu, no city or county in Arizona, including Glendale, can declare a public health disaster under ARS §26-311(A). With no public health disaster, there is no compelling government interest to require citizens like plaintiff to wear face masks in public under Mask Proclamation, and Mask Proclamation fails the first prong of the strict scrutiny standard of review.

<u>Masks most likely increase spread of Covid-19 through increases in public contact with contaminated surfaces</u>

50. As with death counts and number of people infected, plenty of Covid-19 experts

promote misleading data on mask efficacy. Approaching all arguments concerning face mask efficacy in the following manner should help lay people, politicians, and judges address the issue with fact-based decision making rather than the hysteria that has been all too common.

Eliminate all research papers arguing face masks prevent the<br>mask wearer from becoming infected with Covid-19

51. Face mask orders are not meant to protect the face mask wearer from becoming infected with Covid-19 but are instead meant to prevent the face mask wearer from spreading the disease. There is broad scientific consensus on this point. However, that this is still a big area of confusion in the general population, as well as among politicians and judges, is yet another argument against broad, sweeping face mask orders because such orders may give the public a false sense of security that masks protect them from contracting Covid-19. Face mask orders may also mislead the public into believing the primary mode of spread for Covid-19 is through the air when this is far from being established scientifically, despite current claims from the CDC otherwise (see "CDC updates COVID-19 transmission webpage to clarify information about types of spread" available at https://www.cdc.gov/media/releases/2020/s0522-cdc-updates-covid-transmission.html).

52. Birx expressed concerns over masks creating a false sense of security several times when this issue was raised by a reporter during a press briefing on April 2, 2020, before the CDC had yet to issue its recommendation on face masks for the general public:

> Reporter: "Groups are differing in guidance (on masks). The W.H.O. and even the surgeon general have talked about various studies that show that masks, maybe in addition to not even being helpful in protecting people, may actually increase the rates of illness because people touch the masks and then they touch themselves. Can you talk a little about the evolution (of the CDC guidance for masks) on this?"

> Birx: "Let me just say one thing (about masks): The most important thing is social distancing and washing your hands. We don't want people to get an artificial sense of protection because they are behind a mask. Because if they are touching things, remember your eyes are not in the mask, so if you're touching things and then touching your eyes, you're exposing yourself in the same way. So we don't want people to feel like, 'Oh, I'm

wearing a mask. I'm protected, and I'm protecting others. You may be protecting others, but don't get a false sense of security that that mask is protecting you exclusively from getting infected because there are other ways that you can get infected because the number of asymptomatic and mild cases that are out there. And so this worries us, and it's why the debate is continuing about the mask. Because we don't want, when we're trying to send a signal that every single person in the country needs to stay six feet away from everybody, that needs to be washing their hands constantly and know where their hands are, to send a signal that a mask is equivalent to those pieces. So when the advisory comes out it will be an additive piece, if it comes out, rather than saying this is a substitute for. And we want to make sure everybody understands it is not a substitute for the presidential guidelines that have already gone out. And to be absolutely clear about that." ("April 2, 2020 | Members of the Coronavirus Task Force Hold a Press Briefing", at https://www.youtube.com/watch?v=aZLttfUwSk8 , starting at time marker 3:09:11)

53. All arguments and research papers trying to establish that masks help to prevent the wearer from contracting Covid-19 should be eliminated from the conversation as there is strong scientific consensus that this is not the case, especially for the masks being used by the general public that are not top level masks like N95 masks used by medical professionals. Also, the common argument heard from most lay people, politicians, and judges that "masks can't hurt" is completely refuted by Birx, who revealed the true reason why the mask recommendation was delayed for so long by the CDC: Issuing a recommendation for masks may cause greater spread of Covid-19. This contradicts later claims by Fauci that the recommendation for masks by the CDC took so long to come out because the CDC did not want a run on N95 masks that were in short supply at the time ("Fauci: why the public wasn't told to wear masks when the coronavirus pandemic began. The infectious disease expert also discussed why they are necessary" from https://tinyurl.com/ydagmcym, June 16, 2020). This explanation does not pan out given a majority of the population was well aware the mask recommendation from the CDC would refer to things like bandanas and low quality masks that some people were already using at the time. Even reporters were well aware as early as March, 2020, that the real reason the CDC was delaying mask recommendations may be the possibility that Covid-19 was spreading predominantly through surface contacts and not through airborne transmission, an issue that has

yet to be resolved:

> Reporter: "On the masks, maybe for the doctors, is the reason why there is no CDC recommendation for the public to wear masks is because they meant to say reserve the masks for the medical workers or is it because the virus is not primarily transmitted through the air?" ("March 31, 2020 | Members of the Coronavirus Task Force Hold a Press Briefing," https://www.youtube.com/watch?v=e9v8ZZd1P0M, at time marker 3:40:42) (This question was not answered).

54. It is important to note that all the worst fears Birx discussed about miscommunications with the public regarding masks have come to fruition as politicians have rushed to hand down sweeping mask orders without educating the public to be more cognizant of everything they are touching while wearing a mask and especially to avoid touching their own masks. It does not take a massive double-blind study to observe in any Walmart store across the county that these very important directives are being completely ignored by the general public (or more accurately, were never received by the public in the first place), including plenty of examples of Walmart employees who touch their masks and then proceed to touch almost everything in the store, from restocking shelves to bagging groceries at checkout.

Eliminate all research papers that do not collect exhaled aerosol
and droplet samples directly from infected patients

55. The two biggest myths concerning airborne transmission of Covid-19 promulgated by scientists who should know better are: 1) That everything that comes from the mouth of a person infected with Covid-19 contains live Covid-19 virus particles capable of causing infections in others, and 2) live Covid-19 virus particles capable of causing infections in others can travel long distances through the air in the form of tiny, dried out dust particles.

56. When people breathe, talk, cough, or sneeze they expel droplets and aerosols through their mouths. Droplets are tiny spheres of water that fall directly to the ground within a few feet of the person expelling them, usually within a second or two after being expelled. Aerosols are much smaller droplets of water that are so small they don't actually fall to the ground right away

and can float further than a few feet after being expelled. However, because of their small size, aerosols also dry out very quickly and turn into tiny dust particles of dried out virus or bacteria (if any present) and salts, also usually within a second of being expelled from the mouth.

57. In 1934 a researcher by the name of W.F. Wells was the first person to publish a paper that described disease spread through the air in terms of droplets versus aerosols (which he termed droplet nuclei) ("On Air-borne Infections: Study II. Droplets and Droplet Nuclei", W. F. Wells, *American Journal of Epidemiology*, Volume 20, Issue 3, November 1934, Pages 611–618, https://doi.org/10.1093/oxfordjournals.aje.a118097). Dr. Wells was also one of the first people to stress that just because some droplets or aerosols may contain some virus or bacteria particles, it does not mean the virus or bacteria is alive or capable of causing disease in others. This was particularly true in aerosols since all living things require water to live, and once something like a virus or a bacteria "dries out", it is a bit like an egg getting scrambled -- it is difficult, if not impossible, for the virus or bacteria to go back to the way it was just by adding water. According to Wells, a person with tuberculosis (TB) who coughs without covering his mouth expels droplets that may or may not contain live TB bacteria capable of causing disease in others, but these droplets fall to the floor within a few feet of the infected person in about a second. The infected person also expels aerosols that may or may not contain live TB bacteria capable of causing disease, but these aerosols dry out so fast, also in about a second, that it is questionable the dust particles that are left contain enough live TB bacteria to cause disease.

58. In 1934 researchers used crude methods, like placing petri dishes full of culture around a person infected with TB, to detect if droplets or aerosols being expelled from an infected patient contained live TB particles capable of spreading disease. In agreement with Dr. Wells' theories on droplets and aerosols, results of these experiments showed only the petri dishes placed within a foot or two of the coughing TB patient showed any signs of live TB bacteria being exhaled by the patient, i.e., if the patient was expelling aerosols with live TB bacteria, there was no evidence

the bacteria survived long enough to travel beyond just a foot or two from the patient. Wells did not rule out that aerosols containing enough live TB bacteria to cause disease could travel long distances from the coughing TB patient - he only conceded that if they were present, the current methods of detection were not sensitive enough to establish it.

59. Fast forward 85 years later to 2020, and even with much more advanced methods of detection there are still no definitive studies showing any virus particles (flu, cold, Covid-19) that are capable of traveling long distances from an infected person in the form of dried out aerosol dust particles and yet still remain alive and capable of causing disease. In fact the most definitive paper to date regarding the efficacy of masks in slowing the spread of various viruses including coronaviruses [Leung, N.H.L., Chu, D.K.W., Shiu, E.Y.C. *et al.* Respiratory virus shedding in exhaled breath and efficacy of face masks. *Nat Med* 26, 676–680 (2020). https://doi.org/10.1038/s41591-020-0843-2] indicates a person infected with a coronavirus in particular must cough to produce droplets or aerosols that contain any form of the virus, dead or alive. Coronavirus patients who did not cough during the 30 minute time frame of the experiment produced droplets and aerosols that had no detectable traces of coronavirus, rendering moot the entire argument about whether Covid-19 could travel long distances in the form of a dried out aerosol dust particle from an infected person who was just breathing and talking because there are no virus particles to test, dead or alive. These results also render moot any arguments for the efficacy of masks in slowing the spread of Covid-19 from infected people who are just breathing or talking, once again because there are no Covid-19 particles for the mask to stop in the first place. This is in agreement with reports from the World Health Organization that asymptomatic spread of Covid-19 (i.e., spread of Covid-19 from people who are not coughing) appears to be very rare:

> "From the data we have, it still seems to be rare that an asymptomatic person actually transmits onward to a secondary individual," Dr. Maria Van Kerkhove, head of WHO's emerging diseases and zoonosis unit, said at a news briefing from the United Nations agency's Geneva headquarters. "It's very rare." The virus is primarily spread via respiratory droplets when someone coughs or sneezes or if they touch a contaminated

surface, scientists say. (From "Asymptomatic spread of coronavirus is 'very rare,' WHO says," available at https://tinyurl.com/ya53m2yl, June 8, 2020).

60. According to the most definitive study on the efficacy of masks in slowing the spread of Covid-19 (*supra*), masks are useless in stopping the spread of Covid-19 in infected individuals who are only breathing or talking. Masks are only possibly effective at blocking the spread of Covid-19 droplets and aerosols when an infected person coughs, and even this is not definitive because the study never measured if the virus particles collected in these droplets or aerosols were even alive. In addition, this method of prevention of spread of Covid-19 (blocking aerosols and droplets of an infected person who is coughing from being spread long distances) is just as easily achieved by having the infected individual cough into the crook of their elbow. Given the high probability of increased spread of Covid-19 from people touching their contaminated masks (*infra*), coughing into the crook of the elbow is in fact the preferred method of slowing the spread of Covid-19 over mask use.

Eliminate mask arguments that do not take into account increased risk of spread through surfaces

61. Substantial evidence has already been presented that the main reasons for the CDC and for health advisors like Birx to delay mask recommendations until as late as April, 2020, was concern over possible increased spread of Covid-19 through surfaces because of the high chance that many infected people handling their own contaminated masks could unknowingly spread the disease to large numbers of people by touching public surfaces. Birx expressed alarming concern over this form of surface spread of Covid-19 on several occasions during press briefings. In addition to what has already been presented (*supra*), Birx made the following additional comments on the subject of surface spread:

> On March 23, 2020: "You have to assume that everyone you are interacting with could be positive, and that gets into the handwashing piece, and that gets into the other piece we talked about, is surfaces. I think until we really figure out respiratory transmission versus the surface transmission and this hard surface transmission, not fabric, will be really critical because that is a way the virus could spread on subways or metros, where people would be holding on to things that other people had recently held onto. So that's the real question." ("March 23, 2020 | Members of the Coronavirus Task Force Hold a Press

Briefing," https://www.youtube.com/watch?v=yC_L2ae5l3Y, starting at time marker 2:15:40)

On March 23, 2020: "So we're learning a lot about social distancing and respiratory diseases, and I think those are the discussions we have to have in the future, in what you were talking about in changing our whole behavioral patterns in what we touch and being cognizant of that. I remember when I was worried Saturday morning. I was trying to think, What all did I touch on Friday? Did I touch a doorknob? Did I do this? Did I do that? Did I not wash my hands? You go through this whole piece. Did I touch my face by accident? I think this awareness that we all now have that we didn't have before, where we would've pushed through that door or turned that doorknob because we were in such a hurry. Now I think all of us think twice, and all of you think twice." ("March 23, 2020 | Members of the Coronavirus Task Force Hold a Press Briefing," https://www.youtube.com/watch?v=yC_L2ae5l3Y, starting at time marker 2:40:56)

On April 2, 2020: "It's every American that has to make these changes, and I know they are really hard. I know it's hard to remember. I mean, I have to say to myself every day because I'm around very important people to, like, never touch anything, and I'm just like paranoid now about touching things, and I'm sure you are, too." ("April 2, 2020 | Members of the Coronavirus Task Force Hold a Press Briefing," https://www.youtube.com/watch?v=aZLttfUwSk8, starting at time marker 3:49:10)

62. It is clear that as of April, 2020, a major concern for health advisors at the CDC and on the Coronavirus Task Force was surface spread of Covid-19. There has been no data since April, 2020, to suggest surface spread of Covid-19 should not continue to be a major concern at the CDC and may even be a primary method of transmission of the virus over airborne transmission. These valid concerns over surface spread have been mostly ignored in the hysteria over masks in attempting to prevent less well-documented, probably less substantial spread of Covid-19 through the air. None of these concerns about surface spread by Birx and the CDC have been relayed to the public whenever face mask orders have been mandated by local or state governments.

63. While there is no evidence that masks help to decrease spread of Covid-19 in a way that can not be achieved just as easily as by having infected people cough into the crooks of their elbows, there is substantial evidence that masks most likely increase surface spread of Covid-19 and that this should still be a major concern for the CDC as well as for any politicians issuing blanket face mask orders at the state and local level based solely on CDC recommendations.

<u>Evidence of possible decrease in oxygen intake for mask wearers must be included to refute arguments that masks are "harmless"</u>

64. One of the main arguments in favor of face mask orders in the supposed absence of data on how Covid-19 may be transmitted is that mandating masks has no downside. Blatant rights violations aside, this is certainly not the case when concerns over masks inadvertently causing increased surface spread of Covid-19 are taken into account (*supra*). Another possible downside is the effect masks may have on decreasing oxygen intake for the mask wearer, among other health risks studied concerning masks. Most of the studies in this area have been carried out on special N95 masks worn by health care professionals, but there is no reason to assume that other types of masks being mandated by the government for public use do not pose at least some risk in this area, a risk that should not be completely ignored in debates over face mask orders, as is the currently happening.

65. Plaintiff discloses that none of the publications listed below has been critically reviewed by plaintiff. The arguments presented here have been copied in large part from a face mask challenge filed in the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida by the Florida Civil Rights Coalition. That lawsuit is available for public viewing at https://tinyurl.com/y288mdo3.

- A recent study involving 158 healthcare workers aged 21 to 35 years of age found that 81% developed headaches from wearing a face mask. JJY et al. (2020) "Headaches Associated with Personal Protective Equipment A Cross Sectional Study Among Frontline Healthcare Workers *During COVID-19," Journal of Head and Face Pain, May 2020, Vol. 60 Issue 5; 864-877.* See: https://headachejournal.onlinelibrary.wiley.com/doi/full/10.1111/head.13811.

- Researchers examined the blood oxygen levels in 53 surgeons using an oximeter, measuring blood oxygenation before surgery as well as at the end of surgeries. It was discovered that surgical masks reduced the blood oxygen levels (pad) significantly. The longer the duration of wearing the mask, the greater the fall in blood oxygen levels. Bader A et al. (2008) "Preliminary report on surgical mask induced deoxygenation during *major surgery," Neurocirugia 2008;19:12-126.*

- People with cancer who are forced to wear masks are at further risk from prolonged hypoxia as the cancer grows best in a microenvironment that is low in oxygen. Low oxygen also promotes inflammation which can promote the growth, invasion and spread of

cancers. Blaylock RL. (2013) "Immunoexcitatory mechanisms in glioma proliferation, invasion and occasional metastasis," Surg Neurol Inter January 29, 2013; 4:15. See: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3589840/; see also Aggarwal BB. (2004) "Nuclear factor-kappaB: The enemy within," A Cell Press Journal September 1, 2004, Vol. 6, Issue 5; 203-208. See https://www.cell.com/cancer-cell/fulltext/S1535-6108(04)00244-2.

- Based on Australian respirator design standards, it is evident that speech could contribute to inspired CO2 exceeding the maximum allowable concentrations in inspired air." Smith, C. et al. (2013) "Carbon Dioxide rebreathing in respiratory protective *devices, influence speech and work rate in full face mask,"* Ergonomics. 2013; Vol. 56, Issue 5. See https://www.tandfonline.com/doi/abs/10.1080/00140139.2013.777128.

- Wearing N95 masks results in hypooxygenemia and hypercapnia which reduce working efficiency and the ability to make correct decisions...dizziness, headache, and short of breath are commonly experienced by the medical staff wearing N95 masks. The ability to make correct decisions may be hampered, too. The purpose of the study was therefore to evaluate the physiological impact of N95 masks on medical staff." Clinical Trial NCT00173017 "The Physiological impact of N95 mask on medical staff" June 2005. See https://clinicaltrials.gov/ct2/show/NCT00173017.

- It can be concluded that N95 and surgical facemasks can induce significantly different temperatures and humidity in the microclimates of facemasks, which have profound influences on heart rate and thermal stress and subjective perception of discomfort." Y. Li, at el. (2005) "Effects of wearing N95 and surgical facemasks on heart rate, thermal stress and subjective sensations," Int Arch Occup Environ Health. 2005; 78(6): 501-509. Published online 2005 May. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7087880/.

- Wearing a facemask, may cause physiological changes to the Nasal Cavity and statistically significant heart rate and thermal stresses. Zhu, J. et al. (2014) "Effects of long-duration wearing *of N95 respirator and surgical facemask: a pilot study,"* Lung Pulmonary and Respiratory Research. November 22 2014; EISSN: 2376-0060. https://medcraveonline.com/JLPRR/effects-of long-duration-wearing-of-n95-respirator-and-surgical-facemask-a-pilot-study.html.

66. These studies can not be ignored when public health officials try to make the argument that there is no downside to widespread public face mask mandates, even when taking into consideration all the exceptions and exemptions typically listed along with the orders, none of which apply to plaintiff anyway.

## Conclusion

Executive order Mask Proclamation requiring all citizens to wear a face mask while in public violates plaintiff's First Amendment right to free speech and fails both prongs of the strict scrutiny standard of review because the government has not shown the Covid-19 disease qualifies as a public health emergency under ARS §26-311(A) in Glendale, AZ, and because face masks most likely only work to increase the spread of Covid-19 through surface spread. In addition face masks may pose health risks to mask wearers by decreasing oxygen intake. A better way to slow the spread of Covid-19 that eliminates possible increases in contact spread, lowers health risks caused by decreased oxygen intake, and protects plaintiff's right to free speech is to instruct citizens to cough into the crooks of their elbows rather than into masks.

## Prayer for relief

WHEREFORE, plaintiff respectfully prays that the court:

1. Enter a declaration that Mask Proclamation is unconstitutional and void
2. Enter a preliminary and permanent injunction barring defendant Jerry Weiers from enforcing Mask Proclamation against plaintiff
3. Enter a judgement for plaintiff
4. Award fees and costs to plaintiff
5. Grant such further and other relief as the Court deems just and proper.

## Verification

I, Huguette Nicole Young, am the plaintiff in the above-entitled action. I have read the foregoing and know the contents thereof. The same is true of my own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, I believe it to be true. I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed at Bismarck, ND.

Dated: ___10/19/2020___

Respectfully submitted, ___/s/Huguette Nicole Young___

Huguette Nicole Young
24968 Lawrence Rd
Junction City, OR 97448
hn_young@yahoo.com
415-948-8076